ROBERT HILLOCK, TRUSTEE FOR THE USE OF BROWN & LEATON v. THE TRADERS INSURANCE COMPANY.

*Fire insurance—Cancellation of policy—Tender of unearned premium— Estoppel.*

1. The actual tender of unearned premium is unnecessary to the cancellation of an insurance policy if the minds of the parties have met on the point that the policy is to be cancelled; and if the insured directs the insurance agent to procure other insurance for him, it is presumable that he means him to use for the purpose the money that he would have to return, and the direction would be a waiver of such tender.

2. Transactions with reference to the cancellation of an insurance policy are to be construed reasonably and fairly, and in accordance with the evident understanding of the parties at the time.

3. A partner's consent to the cancellation of an insurance policy in which the firm is interested is conclusive on the firm; and a formal surrender of the policy is unimportant, except as evidence of the cancellation.

4. A trustee for the beneficiaries in an insurance policy signed a written acknowledgment that the policy had been cancelled, and in making proof of loss to another company made affidavit that there was no other insurance. It was afterward claimed that he signed these documents without knowing what they contained. *Held*, that they did not estop him from claiming the first-mentioned insurance for the benefit of the cestuis que trustent.

Error to Isabella. (Hart, J.) June 19.—Sept. 13.

Assumpsit. Defendant brings error. Reversed.

*Norris & Uhl* for appellant.

*Dodds Bros.* and *Benton Hanchett* for appellee. When a policy provides that "the insurance may be terminated at any time, at the option of the company, on refunding a ratable proportion of the premium for the unexpired term of the policy," the payment of the ratable proportion of premium is a positive condition precedent upon the performance of which the company's release depends, and unless payment of such part of premium has been made or amount tendered by company, the policy remains in force: *Van Valkenburgh v. Lenox Ins. Co.* 51 N. Y. 468; *Home Ins. Co. v. Curtis* 32 Mich. 405; Wood on Fire Ins. 231; *Poor v. Hudson Ins. Co.* 9 Ins. Law J. 428.

Cooley, C. J. This is an action upon a policy of insurance against loss by fire, bearing date July 24, 1882, and covering the building known as the St. James Hotel in the village of Mt. Pleasant, Michigan, which was destroyed by fire August 29, 1882. The amount of insurance was one thousand dollars. The plaintiff recovered judgment in the circuit court.

The grounds of defense on the merits are principally the following :

1. That neither Hillock, the plaintiff, as trustee, nor Brown & Leaton, as beneficiaries, had such title or interest

in the property as was represented when they applied for the insurance.

2. That the policy was cancelled before any loss occurred.

3. That no notice and proofs of the loss were made after the fire as the policy required.

Upon these points and many others elaborate argument has been had in this Court, but as the second goes to the foundation of all right of action, and as we think it appears beyond question that the cancellation took place as alleged, we do not deem it advisable to consider any other question.

Brown & Leaton were partners, and held the interest they had in the property as such. Brown was the active member of the firm in whatever was done touching this insurance. The policy was issued by Free Estee, the local agent of the defendant at Mt. Pleasant. Soon after its issue one Christianson, an agent of the company, who to some extent supervised for the company the local agencies, went to Mt. Pleasant and after examining the risks taken by defendant at that place, advised that the policy now in question be canceled. He directed Estee to cancel it, and the secretary of the company, under date of August 14, 1882, sent him written direction to cancel, and to "give it prompt attention." Estee thereupon called upon Brown, and notified him that the policy was canceled, and requested a return of the policy. Brown testifies that Estee told him the company refused to carry the risk any longer, and had ordered him to cancel the policy, but added, "I will see if I can put it in some other company for you;" and Brown said, "All right," and further, "Free, be sure that you put it in good companies." Brown says he was then on his way to the train; that he left it entirely to Estee; that he knew him to be careful and reliable in all these matters, and trusted that, as he had other insurance matters, to his judgment and management, because he was careful and reliable in every way; that Estee did not at the time pay or tender to him the unearned premium, and that there was nothing said about the premium at that time; that he had no other conversation with Estee before the fire; that there was another insurance upon the hotel at the time

in the Hartford, but he had not seen either of the policies until quite a while after the fire, when he found them laid away in a drawer of a desk in his private library at his house, among miscellaneous papers, as he thinks, by his wife, but does not know.

Brown further testifies in answer to questions on cross-examination, that at the time of the fire he had no knowledge or intimation that there were any policies on the property except as from the conversation with Estee,—he trusted him to get insurance; that he did not know what had been done by Estee in that regard; that the policy in suit was never at any time in the possession of Hillock; that he did not think Hillock ever saw it; that witness did all the business and acted entirely for the parties in interest; that he had an interview with Estee the next day or next but one after the fire; that Estee inquired for this policy, and said if he would go up into the office he would give him the unearned premium due him from the company; that Estee told him he wanted the policy taken up, as it had been canceled, so he could return it to the company; that witness told him he had not found it and could not find it; that witness had looked for it through Brown & Leaton's papers, and at his house; that witness told Estee he was going away and could not stop, but that Estee could go up to the house and tell Mrs. Brown to look in his safe, and if she could find it she would give it to him; that the reason he assigned for not going up to get the unearned premium was that he was in a hurry to get the train and had no time, and that they could attend to that some other time just as well; that witness at that time had the impression that the policy had never been delivered to him and insisted on it up to the time that he found the policy in his private desk as before stated.

Brown further testified that in this first interview with Estee after the fire he was informed by Estee that he had not placed this risk in other companies as he had been requested to do, for the reason that they would not take it; he had made efforts to place it in other companies and they had declined. As to the delivery of this policy to him, he said

that when he insisted with Estee that the policy had not been delivered to him, Estee was positive it had, and he then told Estee that the policy must have been misplaced, as he could not find it; that when looking for the policy at Estee's request, he intended to deliver it up; that from what Estee had said to him he at the time considered the policy canceled; that when Estee asked him to deliver it up, he stated that the company proposed to hold him liable, and Brown said to him "I don't intend that you shall be damaged in this matter in the least, because you have acted in good faith, and, sooner than have you injured, if there was any question, I would deliver up this policy;" that he did not intend to let Mr. Estee have any trouble; that at the time he regarded the policy as canceled, and would have surrendered it to Estee. He added: "If I knew I had it in my possession, and could have found it, and hadn't been going away, I presume I should have surrendered it to him." The unearned premium, he said, was never offered to him by Estee but once, and this was at the foot of the stairs to Estee's office, when Estee said if witness would go up stairs into his office he would pay him the premium out of his own pocket. Witness made no objection to receiving the money on account of its being Estee's. Leaton was the cause of his failure to accept.

Brown further stated that after the fire he was introduced by Estee to Christianson as the general agent, and Christianson demanded the surrender of the policy, and stated that it had been canceled, and there was no liability on the part of the company and nothing for them to pay, and was very emphatic in his demands for the surrender of the policy; that Christianson said it was the rule of the company and their instruction to their agents, that all these canceled policies should be taken up, and it was his duty to see that this policy was taken up; that this conversation was shortly after the fire,—perhaps a week or ten days, and may be more; that he replied to Christianson that the policy would not be surrendered until he could advise with Leaton, who was then absent, and that Leaton positively objected to the delivery or surrender of the policy and never assented to its

being delivered up.   He was then asked if Christianson did not ask him if the policy had been canceled, and if he did not reply that he so considered it, or words to that effect, and he answered that there may have been words to that effect; that he did not at that time assert any claim; that the conversation may have been a little animated, because he thought it unreasonable in Christianson in not wanting to give him a chance to advise with Mr. Leaton before demanding an eventual surrender of the policy; that he used words to the effect that as far as he was concerned he considered the policy canceled; that Christianson said, in speaking of the cancellation, that so far as the policy was concerned it was no more than so much waste paper, but the instructions of the company required that all canceled policies should be taken up, and it was his duty to see that the agents complied, and he wanted to get the policy and return it to the company.   In answer to a question by plaintiff's counsel Brown further said that the reason why he considered the policy canceled, was because of the trouble in which Estee was placed.   There was only one offer, he said, to pay back the premium money to him, and that was after the fire.   Leaton never consented to the surrender of the policy.

Such was the testimony of Brown.   It differs in some important particulars from that of Estee and Christianson, and in those particulars favors the plaintiff.   The proofs of loss made for the purpose of recovering the insurance money from the Hartford company were made by Hillock, September 5, 1882, and in the sworn statement it is stated that in addition to the sum insured by the Hartford policy, there was no other insurance on the property, and on this statement the loss was paid in full by Estee and receipted by Hillock, who at the same time executed and delivered to Estee the following paper:

"Mt. Pleasant, Mich., Nov. 11, 1882.

I hereby acknowledge that policy No. 95,049, in the Traders' Insurance Company, issued to me on July 24th, 1882, for the amount of one thousand dollars, on St. James Hotel, was duly canceled by Free Estee, agent of said company, on August first day, 1882, and that all rights and claim

under said policy was on that date by me surrendered to said company.

ROBERT HILLOCK, Trustee."

Of the statement Hillock testifies that he did not read it before he signed it; that he was not familiar with insurance matters, and depended on Estee's knowledge of the business, and supposed it was all right; that his recollection was that Estee said the company was here to fix up those matters, and he wanted to get that in shape so that Brown & Leaton could get their insurance; that he could not recollect whether Estee stated what was in the paper—what it was—but he said it was all right, and upon that statement the witness signed it. As to the other paper, the witness said he did not read it or hear it read, but it was presented to him by Estee; that he did not recollect exactly what Estee said about it, but he signed it the same way as he did the other; that Estee said it was all right, and then he signed it, and he does not think that Estee explained what he wanted him to sign it for; that the witness did not know when he signed it that it was an acknowledgment of cancellation of the Traders' policy, and that witness had no knowledge of that policy. On cross-examination he stated that he had not much recollection of the transaction, and that he presumed Estee stated to him the nature and character of the statement of loss which he swore to.

The proofs of loss under the policy of the Traders' Insurance Company were made June 18, 1883, and a copy sent to the company, which appears to have been received July 2, 1883.

This is the evidence upon which the plaintiff must rely as establishing the fact that the policy was in force at the time of the loss.

The policy provided that " this insurance may be terminated at any time at the option of the company on refunding a ratable proportion of the premium for the unexpired term of the policy." Estee, it is agreed on all hands, notified Brown of a cancellation; but it is denied by plaintiff that he returned the insurance money, or that before the fire he made

any offer to return it.   This is Brown's testimony: in this particular he is contradicted by Estee, but the jury have found Brown's statement correct, and it must be so considered.   But this failure to return the premium, while it might in most cases be conclusive against a cancellation (*Home Ins. Co. v. Curtis* 32 Mich. 402; *Van Valkenburgh v. Ins. Co* 51 N. Y. 465) does not appear under the facts of this case to be of the least importance.   Brown and Estee agree that notification was given of the cancellation, and that from that time they understood the cancellation to have taken place.   Their minds met upon it, and but for the fact that Brown had forgotten that he ever received the policy, and did not then have it at hand, it would have been surrendered at that time.   No hint appears of any doubt or contingency about it: Estee was told, even after the fire, that he could have the policy, and was sent to the house with authority to receive it if it could be found.   The suggestion made on behalf of the plaintiff that Brown's acceptance of the cancellation was upon condition that Estee procure new insurance in some other good company, finds no support in the evidence.   The company had an undoubted right to cancel, whether the assured assented or not ; and Brown's direction to Estee to procure other insurance, which must have been upon the understanding that he would use the premium money for the purpose, was a waiver of any tender of its return to him at that time.   All such transactions are to be construed reasonably and fairly, and in accord with the evident understanding of the parties at the time ; and Brown makes it very plain by the full and frank statement he makes, that he and Estee both understood when he told Estee to procure new insurance, that the old was canceled.   If it had been his purpose at the time to insist upon payment or tender as a condition of cancellation, it would have been his duty to say so ; since otherwise Estee would be misled to his injury.   But it is plain that he had no such purpose.

Estee, it seems, no doubt in good faith, in accordance with the understanding with Brown, did make effort to procure other insurance, but had not succeeded in doing so when the

fire occurred. There was nothing then to insure, and nothing
for Estee longer to retain the insurance money for. It is·
agreed that he then offered to return it, though he made no·
formal tender. But a tender was of no importance then ;
the dealings of these parties in respect to this insurance had
come to an end when Brown had responded to the notice of
cancellation that it was all right, and directed the agent to·
procure new insurance. This company was not concerned
with what should take place between Brown and Estee after-
wards. Brown was looking to Estee for new insurance, and
would be entitled to a return from him of the premium
moneys on a failure to obtain it ; and Estee and the company·
would be expected to bring the amount into their own settle-
ments, as they saw fit. And this was Brown's understanding·
until after the fire. In the first interview which then took
place he was ready to surrender the policy if he had had it.

The failure to surrender the policy afterwards, when it was·
found, was in consequence of the objection of Mr. Leaton.
If his assent was necessary, the defense would necessarily
fail, for it clearly appears he never gave it. But it was of·
no consequence. Brown, as partner, had full authority to act
for both, and what he did concluded both. A formal sur-
render of the policy was of no importance except as matter·
of evidence. But it would seem difficult to make the evi--
dence of surrender more conclusive than it was here. Hil-
lock, the trustee, in the following month gave a full and
formal written statement of surrender, over his signature,.
and in his proof of loss to the Hartford company, made oath
that there was at the time no insurance of the property
except in that company. The suggestion rather than state-
ment of Hillock that he signed the one paper and swore to·
the other without knowing what was in them, is entitled to·
no consideration whatever. There can be no safety in busi-
ness transactions of any kind if formal documents may be
thus put aside as of no moment. No charge of fraud is made
in the procurement of these papers from Hillock, and no·
testimony warranting such a charge. The papers do not con-
stitute an estoppel in this case, but they give such conclusive·

support to Brown's understanding as to the surrender as to leave it without question. But in fact his own evidence was conclusive.

Leaton, who was not the party by whom the business was transacted, appears to have believed in good faith that the policy was still in force, and he was entitled to raise the question as he has done. But to sustain his claim it is necessary to insist upon conformity to niceties of law and punctual observance of strict technical rules when the parties at the time did not require but in effect waived it, and when the result would necessarily be surprise and injustice. We cannot do this.

On a full examination of the plaintiff's evidence we think there was nothing in it to justify a submission of the case to the jury. The judgment must therefore be

Reversed and a new trial ordered.

The other Justices concurred.