**John HERD and Gloria Herd, Plaintiffs,**

v.

**AMERICAN SECURITY INS. CO., Defendant.**

No. 06–4284–CV–C–NKL.

United States District Court, W.D. Missouri, Central Division.

July 17, 2007.

Thomas H. Hearne, Hearne & Pivac, Springfield, MO, for Plaintiffs.

Joseph L. Van Ackeren, William Clayton Crawford, Foland, Wickens, Eisfelder, Roper & Hofer, PC, Kansas City, MO, for Defendant.

## ORDER

LAUGHREY, District Judge.

This lawsuit presents an apparent case of first impression in Missouri. In order to resolve Plaintiffs John and Gloria Herd's ("the Herds") Motion for Partial Summary Judgment [Doc. # 24], the Court must decide, among other issues, whether Missouri courts would apply Missouri's valued policy statutes, Mo.Rev.Stat. §§ 379.140–379.145, to an insurance policy placed on the Herd's home by their mortgagee who mistakenly believed the Herds had not insured the house themselves. For the reasons set forth below, the Court grants the Motion in part.

## I. Factual Background

The following facts are either undisputed or assumed in favor of American Security Insurance Co. ("ASIC") as the non-moving party. At some point prior to 2006, the Herds refinanced the mortgage on their home with non-party Bear Sterns Mortgage Co. The new loan was then transferred to non-party EMC Mortgage Co. ("EMC") who mistakenly believed that the Herds had no insurance coverage on their home as required by the terms of

their mortgage. Fearing for its security interest in the house, about $355,200 still owing on the mortgage, EMC notified the Herds of its concern by letter dated April 3, 2006, warning that if the Herds did not provide proof of insurance, EMC would obtain insurance at the Herds' expense. This letter evidently went unanswered, and EMC notified the Herds by a second letter dated May 1, 2006, that it had purchased a 60–day binder of dwelling insurance, or "forced placed coverage," from ASIC and listed the Herds as "additional insureds." The letter also notified the Herds that the forced placed policy could be canceled at any time if the Herds provided proof of their own insurance; but it also warned that if the Herds did not provide such proof before the 60 day period expired, EMC would obtain an annual forced placed coverage policy, the premiums of which would be added to the Herd's mortgage payments. Again the letter went unanswered and on June 29, EMC sent the Herds a third letter informing them that their house was now insured by ASIC for the following year and that the premiums were being charged to them. EMC noted that the insurance covered only the dwelling and not the Herd's personal property, and that the premiums were likely higher than those the Herds could obtain for themselves because the house had been insured without inspection. Nonetheless, the letter informed the Herds that they could still purchase their own insurance and provide proof thereof to EMC, which would automatically cancel the forced place coverage and eliminate further premiums. The Herds never responded and admit that there is a disputed issue of fact whether EMC's letters were properly addressed to them.

On August 4, 2006, the Herds' house was completely destroyed by fire. The Herds collected on their own insurance, which paid the balance on their mortgage to EMC. EMC did not make a claim on the forced place policy because its security interest had been covered by the Herds' insurance. When the Herds confirmed the existence of the ASIC policy and that they were named as additional insureds, they notified ASIC that the home was a total loss and demanded payment on the policy.

The ASIC policy contains the following pertinent language. Under the subheading "CONDITIONS," the policy provides:

2. Other Insurance. If there is any other valid or collectible insurance which would attach if the insurance under this policy had not been effected, this insurance shall apply only as excess and in no event as contributing insurance and then only after all other insurance has been exhausted.

. . . . .

5. Your Duties after Loss. In case of a loss to which this insurance may apply, you shall see that the following duties are performed:

a. give immediate notice to us or our agent;

b. protect the property from further damage. . . .

c. exhibit the damaged property as often as we reasonably require;

d. submit to signed statements and examinations under oath; and

e. submit to us, within 60 days after we request, your signed, sworn statement of loss which sets forth, to the best of your knowledge and belief:

(1) the time and cause of loss;

(2) the interest of you and all others in the property involved and all encumbrances on the property;

(3) other insurance which may cover the loss

(4) changes in title or occupancy of the property during the term of the policy; and

(5) specifications of any damaged building and detailed estimates for repair of the damage.

. . . . .

18. Cancellation.

a. Coverage under this policy shall automatically and without prior notice cancel ... when the Named Insured has been provided with another policy that meets the requirements of the Named Insured as set forth in the mortgage agreement applicable to the Described Property."

The Herds exhibited the damaged property upon ASIC's request as per ¶ 5(c) of the Conditions section of the policy. Although ¶ 5(d) requires that the insured "submit to signed statements and examinations under oath," ASIC has submitted no evidence that it requested either from the Herds. Instead, the record shows that ASIC requested that the Herds submit to a "recorded statement." The Herds' counsel responded to ASIC's request, noting that a "recorded statement" was not required under the policy but that the Herds would agree to make one "in lieu of the other duties of the insured." [Doc. # 35, Ex. C]. It is unclear from the record whether a recorded statement was ever made, but in any event ASIC contends that a "recorded statement" and an "examination under oath" are the same thing.

Also unclear from the record is whether the Herds had a duty to notify EMC of their homeowners insurance, and whether their breach of that duty resulted in EMC's mistaken impression that the house was not insured. In its initial response to the Herds' Motion for Partial Summary Judgment, ASIC argued under Rule 56(f) that more time was needed for discovery of the Herds' mortgage documents to properly respond to the Herds' statement of uncontroverted facts and to support ASIC's affirmative defenses. Since the Motion became fully briefed, ASIC has moved for and been granted leave to file a surreply in which it offers a recently discovered Escrow Waiver Agreement signed by the Herds in conjunction with their mortgage, which contains the following language:

We, the undersigned, do in consideration for the waiver of the escrow requirements outlined in our Deed of Trust/Mortgage dated 01/23/06 agree to pay all tax assessments, ground rents, and homeowners associated fees, if any, to avoid items which may be placed on the above referenced property for nonpayment. Also, we will maintain sufficient insurance coverage to protect said property from any casualty loss which may occur to the premises.

Proof of payment must be submitted promptly by copy of tax receipts or premium receipts to

EMC Mortgage Corporation

Its successors and/or assigns

P.O. Box 7589

Springfield, OH 45501–7589

within 30 days from the date due.

If proof of payment is not provided, we understand that EMC Mortgage Corporation may establish an escrow account for payment of tax assessments and insurance premiums to protect its security in the referenced mortgaged property in accordance with the Deed of Trust/Mortgage

[Doc. # 39–3]. It is evidently undisputed that the Herds did not provide EMC with proof of payment of any homeowners' insurance in the form of premium receipts despite the multiple letters EMC sent to the Herds requesting such proof, all of which went unanswered.

On August 31, 2006, the Herds demanded payment on the ASIC policy. ASIC denied the claim on October 3, 2006. EMC's mortgage was paid in full on November 13, 2006, from the proceeds of the Herds' other insurance policies. EMC subsequently released the Deed of Trust to the Herds and the Herds filed the present lawsuit against ASIC.

## II. Discussion

The Herds seek partial summary judgment on several of ASIC's affirmative defenses.

### A. Affirmative Defense 2

ASIC asserts that "plaintiffs have failed to meet the terms and conditions for coverage under any policy of insurance and/or endorsement issued by defendant for the loss alleged in plaintiffs' Petition." Ans. at 2. Although the defense does not enumerate the unfulfilled conditions for coverage, the Herds claim that they complied with all five subparts listed under Condition 5— Your Duties after Loss. Specifically, they contend that they a) gave immediate notice to ASIC; b) protected the property from further damage; c) exhibited the damaged property to ASIC; and d) were never asked to "submit to signed statements and examinations under oath" or e) to submit a signed, sworn statement of loss.

ASIC has produced no evidence that it requested the Herds to "submit to signed statements and examinations under oath" or "submit a signed, sworn statement of loss." It has submitted an affidavit from Johanna D'Arpa stating that "Plaintiffs did not submit to statements and examinations under oath," [Doc. 35, Ex. A] but the affidavit does not state that it is based on any personal knowledge of the affiant; nor does it state that ASIC ever requested that the Herds "submit to" the statements or examinations required by ¶ 5(d). The phrase "submit to" indicates that a request is necessary to trigger the condition but the Herds have submitted an affidavit stating that ASIC "never requested that we 'submit to signed statements' or 'examinations under oath'" [Doc. # 26–2, Ex. 2]. The Herds' affidavit also states that ASIC never requested that they "submit a 'signed, sworn statement of loss,'" either [Doc. # 26–2, Ex. 2]; however, the language of ¶ 5 says only "submit," not "submit to," indicating an affirmative duty on the part of the Herds to submit a "signed, sworn statement of loss" without being asked to do so.

In any event, ASIC claims that it did request compliance with both conditions d and e in the form of a "recorded statement," which it says the Herds refused to submit. The only evidence of ASIC's request is found in a letter from Plaintiffs counsel to ASIC's, noting that the insurance contract does not require a "recorded statement" but that the Herds would agree to one "in lieu of other duties of an insured." There is also an ambiguous fax, purportedly from ASIC but bearing the letterhead "Assurant Specialty Property," which references the Herds' counsel's offer of a recorded statement obliquely; and another letter from the Herds' counsel regarding the fax and purportedly "confirm[ing] our agreement that [the Herds] will provide a recorded statement to American Security in lieu of the other duties of an insured under the policy."

■ In short, there is evidence that ASIC requested that the Herds comply with a condition not enumerated in ¶ 5 and that the Herds were apparently willing to accede to the request in lieu of the conditions that were listed in that paragraph. It is unclear from the record whether a "recorded statement" was ever made or submitted. It is also unclear from the record whether the Herds ever submitted a "signed, sworn statement of loss." The only evidence before the Court is that the

former was evidently agreed to by the Plaintiffs and the latter was never requested by the Defendant. However, the burden of proof for establishing an affirmative defense is on the defendant, and ASIC has failed to produce any evidence from which a reasonable juror could find that the Herds did not comply with the conditions enumerated in ¶ 5 of the Conditions section of the policy. Summary judgment on Affirmative Defense 2 is therefore appropriate.

## B. Affirmative Defenses 4 and 5

ASIC's fourth and fifth affirmative defenses raise the same issue and assert as follows:

4. Without waiving any affirmative defenses or denials, plaintiffs' alleged damages have been paid in full by other applicable insurance and therefore, plaintiffs' claims are barred by accord and satisfaction, and any further payment will constitute double and multiple recoveries of damages in conflict with Missouri Law preventing windfall recoveries.

5. Without waiving any affirmative defenses or denials, Missouri value added policy statutes do not apply to force placed insurance.

Ans. ¶¶ 4–5. Necessary to both defenses is the inapplicability of Missouri's valued policy statutes, Mo.Rev.Stat. §§ 379.140–379.145, which provide as follows:

In all suits brought upon policies of insurance against loss or damage by fire hereafter issued or renewed, the defendant shall not be permitted to deny that the property insured thereby was worth at the time of the issuing of the policy the full amount insured therein on said property; and in case of total loss of the property insured, the measure of damage shall be the amount for which the same was insured, less whatever depreciation in value, below the amount for which the property is insured, the property may have sustained between the time of issuing the policy and the time of the loss, and the burden of proving such depreciation shall be upon the defendant.

*Id.* § 379.140;

1. When fire insurance policies shall be hereafter issued or renewed by more than one company upon the same property, and suit shall be brought upon any of said policies, the defendant shall not be permitted to deny that the property insured was worth the aggregate of the several amounts for which it was insured at the time the policy was issued or renewed thereon, unless willful fraud or misrepresentation is shown on part of the insured in obtaining such additional insurance; and in such suit the measure of damage shall be as provided in section 379.140; provided, that whatever depreciation in value below the amount for which the property is insured may be shown, as provided in section 379.140, shall be deducted from the amount insured in each policy, in the proportion which the amount in each such policy bears to the aggregate of all the amounts so insured on such property.

2. This and section 379.140 shall apply only to real property insured.

3. Any condition in any policy of insurance contrary to the provisions of this chapter shall be illegal and void.

*Id.* § 379.145.

■ As the Missouri Supreme Court has explained, "The purpose of the valued policy statute[s] is to place upon the insurers the burden and responsibility for an evaluation of the insured's interest and of the property insured at the date of the insurance contract." *DeWitt v. American Family Mut. Ins. Co.,* 667 S.W.2d 700, 707–708 (Mo.1984). "Under these statutes, the insurer is estopped from denying

that the value of the insured property, at the time the policy was written, was equal to the policy amount." *Marti v. Economy Fire & Casualty Co.,* 761 S.W.2d 254, 258–259 (Mo.Ct.App.1988) (citing *Wells v. Missouri Property Insurance Placement Facility,* 653 S.W.2d 207, 210 (Mo. banc 1983)).

In *Marti,* the insured's property was covered by multiple insurance policies. The defendant insurance company argued that it was only liable for a pro rata share of the loss because a provision in the policy provided, "7. Other insurance. If a loss covered by this policy is also covered by other insurance, we will pay only the portion of the loss that the limits of liability that applies under the policy bears to the total amount of insurance covering the loss." *Id.* The Missouri Court of Appeals disagreed, citing the valued policy statutes:

> When parties enter into a contract upon a subject which is highly regulated, it is presumed that they entered into the contract with reference to the statutes and that the statutes are part of the contract. Therefore, any exclusionary provision which attempts to limit the insurer's liability to less than the face value of the policy in a case of total loss is contrary to the valued policy statute and void.

*Id.* at 259 (citing Mo.Rev.Stat. § 379.145.3) (internal citations omitted).

■ Although there are several key differences between the facts of the present case and those of *Marti,* both cases involve multiple fire insurance policies on the same property. ASIC's Affirmative Defense Number 4 of accord and satisfaction based on the full payment under one policy must fail under the plain language of the valued policy statutes. Accord and satisfaction means that the aggrieved party has been compensated in full for its loss. Such a defense could only apply under the valued policy statute if the Herds had been

compensated for "the aggregate of the several amounts for which [their property] was insured" since the insurance companies "shall not be permitted to deny" that the aggregate of coverage was the full amount of their loss. Mo.Rev.Stat. § 379.145(1). As ASIC's accord and satisfaction defense implies that the Herds are entitled to less than the aggregate of their several policies, the defense is void under the valued policy statutes.

Similarly, the plain language of the statutes would seem to defeat Affirmative Defense Number 5, that the valued policy statutes do not apply to forced placed coverage in the first place. The statute makes no exception for forced placed coverage. The only exception is for coverage procured by "willful fraud or misrepresentation," neither of which is alleged. Missouri courts follow the maxim of statutory construction, *expressio unius est exclusio alterius,* or the expression of one is the exclusion of others. *Six Flags Theme Parks, Inc. v. Dir. of Revenue,* 179 S.W.3d 266, 269 (Mo.2005). Although this maxim "should be invoked only when it would be natural to assume by a strong contrast that that which is omitted must have been intended for the opposite treatment," *id.,* the valued policy statute explicitly renders void "[a]ny condition in any policy of insurance contrary to the provisions of this chapter." *Id.* § 379.145(3). Thus, it is natural to assume that any exception other than fraud or misrepresentation was not intended to apply.

As to the latter defense, whether the valued policy statutes apply to forced placed coverage, the parties have not provided—and the Court is unaware of—any Missouri decision on point. However, ASIC argues that other jurisdictions have refused to apply their valued policy statutes to forced place coverage. Despite the use of the plural, ASIC offers only one

case in support of its argument. *See Louisiana Farm Bureau Mut. Ins. Co. v. Underwriters at Lloyds,* 711 So.2d 797, 800 (La.Ct.App.1998) ("a fire policy secured by a mortgagee insures a different interest in the property than one secured by the property owner"). Although the facts of *Louisiana Farm Bureau* bear some striking similarities to the present case, its holding lends little support to ASIC's argument.

In *Louisiana Farm Bureau,* Paul Pecora purchased a home from Central Progressive Bank ("the Bank"). The home was initially insured by plaintiff Louisiana Farm Bureau, but that policy was cancelled on February 24, 1994, because Pecora had not paid his dues. Farm Bureau notified the Bank of the cancellation on March 24, but also stated that "In accordance with the Mortgage Clause, we will continue to protect your [the Bank's] interest until 12:01 A.M., 04/13/94." *Id.* at 798. That same week, another underwriter from Farm Bureau wrote the Bank a second letter, advising that the "policy will not be renewed effective June 23, 1994, because of underwriting reasons. In accordance with the Mortgage Clause, we will continue to protect your interest until 12:01 A.M., June 23, 1994." *Id.* When it received the first cancellation notice, the Bank secured "forced placed coverage" under a blanket mortgage security policy from defendant Certain Underwriters at Lloyds to protect its security interest in Pecora's house. Normally, if the Bank received notice that the home was insured elsewhere, it would retroactively cancel its policy with Lloyds; however, even though the Bank received the second notice from Farm Bureau stating that its security interest was still covered until June 23, the Bank did not remove Pecora's house from its Lloyds policy. On April 25, 1994, Pecora's home was damaged by arson. *Id.*

Due to the confusing and contradictory letters issued to the Bank, Farm Bureau paid the Bank the balance due on Pecora's loan. Thereafter, the Bank assigned its rights under the Lloyds policy to Farm Bureau who, in turn, sued Lloyds to collect the amount it had paid the Bank under the original policy or, in the alternative, to recover a pro rata share of its loss. *Id.* at 799. The trial court granted summary judgment to Lloyds, explaining its decision as follows:

> On March 24, a letter was sent to the bank indicating the policy would lapse April 13, 1994. That was dated March 24. On March 29, a letter was sent to the bank saying that they will continue to protect the interest of the bank until June 23, 1994. Obviously a mistake was made, but I think the mistake was obviously also Louisiana Farm Bureau's mistake, and they must suffer for that mistake, not other parties. It's clear to me that Lloyd's policy was excess coverage, and it's also clear that the bank had a right to rely upon ... Farm Bureau's second letter.

*Id.* at 799. Farm Bureau appealed, arguing that the court had failed to apply La. Rev.Stat. § 22:691, which ASIC claims is analogous to Missouri's valued policy statutes. While La.Rev.Stat. § 22:691 is similar to Mo.Rev.Stat. § 379.160 in that both prescribe the form of fire insurance policies within their respective states, ASIC seems to confuse these statutes with La. Rev.Stat. § 22:695 and Mo.Rev.Stat. § 379.145, respectively, which are the valued policy statutes for each state. La.Rev. Stat. § 22:695, like Missouri's valued policy statute, provides that

> if the insurer places a valuation upon the covered property and uses such valuation for purposes of determining the premium charge to be made under the policy, in the case of total loss the insur-

er shall compute and indemnify or compensate any covered loss of, or damage to, such property which occurs during the term of the policy at such valuation without deduction or offset. . . .

Any clause, condition, or provision of a policy of fire insurance contrary to the provisions of this Section shall be null and void, and have no legal effect.

*Id.* However, it was not the valued policy statute, La.Rev.Stat. § 22:695, at issue in *Louisiana Farm Bureau,* but the form policy statute, La.Rev.Stat. § 22:691. Specifically, Farm Bureau argued that the Lloyds policy did not conform with the form fire insurance policy required by § 22.691 in that it didn't contain the following requisite language: "Pro rata liability.—This Company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not." *Id.* The Louisiana Court of Appeals rejected this argument, however, holding that

a blanket mortgage security policy is not a standard fire policy but is *sui generis* . . . . This policy was not issued to a homeowner, but to a bank. It covers only the mortgagee's financial interest in the property. Over one hundred years ago . . . our supreme court recognized that a fire policy secured by a mortgagee insures a different interest in the property than one secured by the property owner.

*Louisiana Farm Bureau,* 711 So.2d at 800.

Strictly speaking, therefore, the holding of *Louisiana Farm Bureau* has nothing to do with Louisiana's valued policy statute. Nevertheless, the argument could be made that the Louisiana Court of Appeals might apply the same logic to the valued policy statutes as it did to the form policy statute, namely that blanket mortgage security

policies—what ASIC refers to as forced placed coverage policies—are not standard fire policies but are instead *sui generis.* Since such policies are not issued to homeowners but rather to their mortgage banks, and since they cover only the mortgagee's financial interest in the property and not the homeowner's, applying the valued policy statute would "make[ ] no sense in the context of a blanket mortgage security policy." *Id.* This argument would be more persuasive if Louisiana had not, subsequent to *Louisiana Farm Bureau,* found it necessary to amend its valued policy statute explicitly to exclude forced placed coverage:

Be it enacted by the Legislature of Louisiana:

Section 1. R.S. 22:695(D) is hereby amended and reenacted to read as follows:

Section 695. Valued policy clause; exceptions

D. This Section shall only apply to policies issued or renewed after January 1, 1992, and shall not apply to loss covered by a blanket-form policy of insurance nor to a loss covered by a builders risk policy of insurance.

La. HB 2405, 1995 La. ALS 737 (1995). Even if the Louisiana valued policy statute had not been explicitly amended to exclude forced placed coverage, this Court is not persuaded that Louisiana courts would read an implicit exclusion into that law based on a holding about Louisiana's form policy statute. The argument for finding an implicit exclusion in Missouri's valued policy statute is even less persuasive given the clear statutory language of the Missouri law enumerating only a single exception for fraud by the insured.

ASIC offers no authority from Missouri or elsewhere for reading forced placed coverage out of Missouri's valued policy statutes, and the Court's own research has

found no relevant exceptions. ASIC directs the Court's attention to *Gorman v. Farm Bureau Town & Country Ins. Co.*, 977 S.W.2d 519 (Mo.Ct.App.1998), but that case merely stands for the proposition that, despite the valued policy statutes, an insurer

> may protect itself by strictly defining the interest covered by its policy, or by obtaining representations or warranties about the state of the title, if it deems this information important. What it cannot do is to issue a policy, collect the premiums, and then argue that the value of the insured's insurable interest in the property is less than the coverage it underwrites.

*Id.* at 524. *Gorman* says nothing about forced placed coverage, nor exempts it from the valued policy statute.

Similarly unavailing is ASIC's reliance on *Wells v. Missouri Property Ins. Placement Facility*, 653 S.W.2d 207 (Mo.1983), even though that case held that the valued policy statutes did not apply to Missouri Fair Access to Insurance Requirements ("FAIR") policies. In *Wells*, the Missouri Supreme Court initially noted that the valued policy statutes

> clearly affect private insurance contracts that result from direct negotiations between the insurance company and the consumer. Whether these statutes affect insurance coverage procured through the Missouri FAIR Plan, however, is an altogether different matter. In order to make that determination it is necessary to examine the history of, and the policies that underlie, the FAIR Plan.

*Id.* at 211. Considering the "beneficent purpose of the FAIR Plan and the express language of the statutes creating it," the supreme court concluded that "the legislature intended to establish a mechanism by which owners of high-risk property may obtain insurance coverage only to the ex-

tent necessary to protect their interests." *Id.* at 212. Concomitantly, the court held that the FAIR Plan was meant to impose upon insurers "the burden of insuring high-risk property only to the extent of its actual cash value at the time of the loss. Nothing in the history of the FAIR Plan suggests that the legislature intended to require FAIR Plan insurers to provide anything other than no-frills insurance for the benefit of those who could not otherwise obtain coverage." *Id.* at 212–213. Finding that the intent of the FAIR plan "obviously conflicts" with the valued policy statutes, the Missouri Supreme Court held that

> the valued policy statutes do not apply to insurance coverage procured through the FAIR Plan ... for three reasons. First, the valued policy statutes were enacted well before the turn of the century and were a static part of Missouri law at the time the FAIR Plan was established. The legislature presumably was well aware of those statutes and the judicial construction given them. With this knowledge the legislature designed the FAIR Plan in the manner in which it did. Second, and related to the first, is the fact that because the FAIR Plan statutes were enacted well after the valued policy statutes were enacted, the later statutes prevail if inconsistencies appear between them. Third, the FAIR Plan has a specific application to this particular kind of property insurance, while the valued policy statutes are general in application. Provisions having special application to a particular subject will be deemed a qualification to another statute general in its terms.

*Id.* at 213 (citations and alterations in original omitted).

While *Wells* does suggest that the valued policy statutes are not applicable to all insurance policies, the basis for that hold-

ing was a conflict between the valued policy statutes and subsequent, conflicting legislation. There is no conflicting legislation at issue in the present case, only a conflicting insurance policy, the language of which is rendered void by Mo.Rev.Stat. § 379.145(3) ("Any condition in any policy of insurance contrary to the provisions of this chapter shall be illegal and void."). Moreover, the specific nature of the FAIR plan legislation trumped the more general policy goals of the valued policy statutes. As there is no more specific legislation at issue here to take this case out of the more general statutory scheme underlying the valued policy laws, *Wells* is inapposite to the present case.

■ In the absence of any persuasive authority to the contrary, the Court gives Mo.Rev.Stat. § 379.145 its plain meaning: where fire insurance policies, including forced placed coverage polices, are issued by more than one company upon the same property, neither insurer shall not be permitted to deny that the property insured was worth the aggregate of the several amounts for which it was insured at the time the policies were issued absent willful fraud or misrepresentation on the part of the insured. Accordingly, ASIC's affirmative defenses numbers 4 and 5 must fail as a matter of law.

### C. Affirmative Defense 6

■ ASIC affirmatively pleads that it "issued and provided the subject endorsement based on unilateral or mutual mistake of fact and therefore, said endorsement is void or voidable." Resisting the Herds' motion for partial summary judgment as to this defense, ASIC asks the Court for more time to conduct discovery into the mailing of EMC's notices to the Herds and why the Herds did not respond to them, among other issues. "Whether parties are laboring under a mutual mistake is normally a question of fact."

*Brown v. Mickelson,* 220 S.W.3d 442, 448 (Mo.Ct.App.2007). At this early stage of the litigation, the Court cannot say that ASIC will not be able to demonstrate that the policy at issue was the result of a unilateral or mutual mistake of fact. Summary judgment is therefore denied as to defense number 6 under Fed.R.Civ.P. 56(f).

### D. Affirmative Defense 7

■ Under this defense, ASIC alleges that "plaintiffs failed to meet their obligations under their mortgage agreement to report the existence of other applicable insurance and to keep their mortgage company apprised of insurance covering the subject property, and therefore, plaintiffs are estopped from recovering from defendant and/or have waived all rights of recovery under the subject endorsement." Ans. at 3. However, ASIC is neither a party to, nor a third party beneficiary of, the mortgage contract. While ASIC states that further discovery is necessary to show the extent of any alleged breaches, it has failed to provide the Court with any legal authority allowing it to assert contractual rights or obligations arising out of a contract to which it was not a party.

In its response brief, ASIC claims Affirmative Defense Number 7 "encompasses several defenses" including unclean hands and, implicitly by reference to the valued policy statute, fraud or misrepresentation. Neither of these defenses is apparent from the language of Defense Number 7 itself, however, and the Court will not read a request for equity into what is otherwise a simple contractual defense. Should ASIC wish to raise either defense of fraud or unclean hands, they must do so through amendment. Summary Judgment is granted as to Affirmative Defense Number 7.

### E. Affirmative Defense 9

 ASIC alleges that "plaintiffs' alleged losses and damages, if any, are not covered by any insurance policy and/or endorsement issued by defendant because the coverage afforded by operation of the subject endorsement was cancelled by operation of the plain and unambiguous terms of the subject policy and endorsement." Ans. at 3. The cancellation provision of the policy provides as follows:

> Coverage under this policy shall automatically and without prior notice cancel ... when the Named Insured *has been provided with another policy that meets the requirements of the Named Insured* as set forth in the mortgage agreement applicable to the Described Property.

Policy at ¶ 18 (emphasis added). "[W]here an insurance policy contains a specific provision for cancellation by either party, it is binding upon the parties and must be strictly complied with in order to terminate the policy." *Gambill v. Cedar Fork Mut. Aid Soc'y*, 967 S.W.2d 310, 312 (Mo. Ct.App.1998). "The burden of proving cancellation is on the party asserting it." *Id.* The Herds argue that the three letters EMC sent to the Herds indicating its belief that the Herds' home was uninsured and informing the Herds that it was securing forced place coverage are admissions that EMC had not been provided with another policy that met its requirements.

 ASIC argues that what EMC and ASIC meant by the words "provided with" in the cancellation clause is a disputed issue of fact for which further discovery is required. However, "If a contract is plain and unambiguous, the meaning thereof is a question of law for the court." *Jones Co. Custom Homes of Tenn., Inc. v. Commerce Bank, N.A.*, 116 S.W.3d 653, 657 (Mo.Ct.App.2003). The Court finds the term "provide" unambiguous and gives it its plain meaning as found in the 2006 edition of the of the Random House Una-

bridged Dictionary: "1. to make available; furnish: to provide employees with various benefits; 2. to supply or equip: to provide the army with new fighter planes; 3. to afford or yield." Given the repeated letters from EMC notifying the Herds of its belief that they did not have insurance coverage, it cannot be said that the Herds had made available, furnished, supplied, afforded, or yielded another policy to EMC. The mere fact that the Herds had insurance coverage all along does not mean that they "provided [EMC] with another policy" that met its requirements. Given EMC's May 1, 2006, letter warning that "If you do not provide us with proof of insurance coverage before the end of the binder period, we will be required to obtain a one-year policy on your property," Pl.Ex. M., and given the fact that EMC went on to procure the annual policy, no reasonable juror could find that the Herds had provided EMC with another policy that met its requirements. Strictly construing the cancellation provision, Affirmative Defense Number 9 fails as a matter of law.

### F. Other Affirmative Defenses

In two final paragraphs, the Herds ask for summary judgment on ASIC's Affirmative Defenses Number 8, 10, and 11. Neither paragraph establishes the absence of any genuine issue of material fact, nor demonstrates that the Herds are entitled to judgment as a matter of law on these defenses. Summary judgment is therefore denied as to the remaining affirmative defenses.

### II. Conclusion

Accordingly, it is hereby

ORDERED that Plaintiffs' Motion for Partial Summary Judgment is GRANTED in PART and DENIED in PART. It is GRANTED as to Affirmative Defenses

Number 2, 4, 5, 7 and 9. The Motion is otherwise DENIED.